IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MARGARET PETTIT,<br><br>    Plaintiff,<br><br>vs.<br><br>UNUMPROVIDENT CORPORATION, d/b/a UNUM GROUP, d/b/a UNUM GROUP CORPORATION,<br><br>    Defendant. | **No. 4:10-cv-00021 – JEG**<br><br>**O R D E R** |

Plaintiff Margaret Pettit ("Pettit") filed this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001-1461, seeking judicial review of an appeal from the denial of long-term disability benefits by Defendant UnumProvident Corporation ("Unum"). Pettit further seeks review of Unum's calculation of benefits made payable as a result of her mental disability. The matter is submitted without oral argument on the administrative record and the briefs of the parties.

## I.    BACKGROUND

Pettit was hired by Great River Health Systems, Inc. ("Great River"), on August 12, 1999. As a Great River employee, Pettit was eligible for coverage under Great River's long-term disability plan (the "Plan"). The Plan is part of an "employee welfare benefit plan" covered by ERISA. 29 U.S.C. § 1002(1).

The Plan names Great River as the Plan administrator "with authority to delegate its duties." A.R. 29. The Plan designates Unum as a claims fiduciary, providing that Unum, as the administrator's designee, "has discretionary authority to determine . . . eligibility for benefits and to interpret the terms and provisions of the [Plan]." A.R. 11, 34. A participant is deemed disabled under the Plan when Unum determines that the participant (1) is "limited from performing the **material and substantial duties** of [his/her] **regular occupation** due to [his/her] **sickness** or **injury**;" and (2) has "a 20% or more loss in [his/her] indexed monthly earnings due to the same

sickness or injury." A.R. 15. After twenty-four months of payments, however, a participant is deemed disabled only if Unum determines "that due to the same sickness or injury," the participant is "unable to perform the duties of any **gainful occupation**" for which the participant is "reasonably fitted by education, training or experience." <u>Id.</u>

During her employment with Great River, Pettit worked as a surgical technician in the Digestive Health Center and later as a Certified Registered Nurse ("CRN") in the Acute Care Unit. A.R. 80. In the course of her employment, Pettit was responsible for cleaning medical equipment with a chemical called Cidex. Pettit began to experience adverse reactions to Cidex while working with this chemical. Specifically, Pettit experienced "problems with her eyes burning, coughing, sneezing, nose plugging and running whenever she went into [a] room where Cidex was." A.R. 568. On at least one occasion, Pettit presented to the emergency room with "coughing, [and] burning swollen eyes" after being exposed to Cidex. A.R. 314, 225. The attending physician diagnosed Pettit with "bronchiospasms [secondary] to chemical exposure." A.R. 313.

Pettit has a history of problems with allergies. She received treatment for her allergies while employed with Great River on numerous occasions. On March 28, 2006, Thomas Boyd, D.O., Pettit's primary physician, examined Pettit and noted that she was "having a lot of problems with allergies" and was "reacting to the chemicals used to clean instruments at her job." A.R. 732. Pettit was referred to David Wegner-Keller, M.D., an allergy specialist, who diagnosed Pettit with latex allergy, contact metal sensitivity, "perennial allergic rhinitis and seasonal rhinitis as well as chronic cough." A.R 733, 567. Dr. Wegner-Keller also opined that Pettit was intolerant to Cidex and recommended that she wear a charcoal mask around this chemical or avoid contact with it completely. On or about October 30, 2006, after Pettit presented to Dr. Boyd with watery eyes, a runny nose and cough, Dr. Boyd made a diagnosis of

"[a]llergic rhinitis with Cidex intolerance" and recommended that Pettit "consider rotating every 2 to 3 days to other work stations, to avoid Cidex exposure."  A.R. 204.

Pettit also treated with Ravinder Agarwal, M.D., an allergy specialist, who confirmed the diagnosis of chronic rhinitis and also diagnosed Pettit with allergies to dust mites, cat, ragweed and latex.  Dr. Agarwal recommended that Pettit undergo desensitization therapy to help control her symptoms.  Pettit appears not to have received such therapy, however, due partially to her lack of resources.

Pettit was directed to visit Great River's occupational medicine provider as a result of the problems she was experiencing with her allergies while at work.  On February 6, 2007, Pettit saw Patrick Bredar, PA-C, for "an evaluation secondary to chronic recurrence of shortness of breath, coughing, sneezing and breaking out in hives."  A.R. 289.  Mr. Bredar noted that Pettit appeared to develop "an asthmatic reaction with [a] runny nose, [and] shortness of breath" when exposed to Cidex.  Id.  Mr. Bredar recommended that Pettit "be placed on restricted duty from the use only of the Cidex chemical" but indicated she could return to work  A.R. 290.

Pettit saw Ricky Garrels, M.D., another occupational medicine provider for Great River on February 8, 2007, with "complaints of respiratory issues related to Cidex exposure."  A.R. 288.  Dr. Garrels observed congestion in Pettit's upper airways, provided an assessment of allergies and rhinitis, and placed Pettit "on restrictions to avoid exposure to all chemicals, mist, vapors, and odors."  Id.

On March 8, 2007, Dr. Garrels saw Pettit for a follow up examination.  In his notes, Dr. Garrels reported that Pettit was missing a substantial amount of work.  Dr. Garrels noted that Pettit has "significant environmental allergens including household dust, corn smut, and cats" and indicated that Pettit was complaining of increased nasal symptoms with "any exposure to dust, mist, vapor, chemical, or odor."  A.R. 286.  Following his examination, Dr. Garrels opined, "At this point, I do not think there is anything more that I can offer her other than to suggest that

she have a permanent restriction for avoiding exposure to all chemicals, dust, mist, vapors, or odors. . . . She is at maximal medical improvement." Id. Dr. Garrels also discussed "the idea of disability" with Pettit based upon his impression that "the number of problems that she is having are essentially adding up to a situation where she is not able to be at work the majority of the time." Id. Dr. Garrels did advise Pettit to return to work, however.

In addition to her allergies, Pettit has a history of anxiety and depression. On March 29, 2006, Gary Szymula, Ph.D., with Great River Mental Health Care Associates, examined Pettit and noted that she was "having severe problems at work related to depression and anxiety," and that she was "having panic attacks which intensified after the threat of being fired" due to excessive absences from work. A.R. 1435. Following his evaluation, Dr. Szymula diagnosed Pettit with major depressive disorder and panic disorder without agoraphobia and explained that he would document Pettit's concerns to "protect her from possible early termination." A.R. 1436. Pettit's panic attacks persisted despite recommendations from Dr. Szymula for reducing stress.

On March 3, 2007, Pettit treated with Robert Strayhan, M.D., for mental health issues. Pettit reported that she was experiencing "almost constant anxiety" with "3-4 major panic attacks per week." A.R. 954. The panic attacks made Pettit fearful of leaving home, and the most severe attacks required her to be placed on oxygen in the emergency room. Dr. Strayhan opined, "The patient appears at times to have an increased focus on somatic concerns and fears of illness due to chemical exposure. It does appear that the concerns about respiratory status result in precipitation of respiratory stress." A.R. 956. Dr. Strayhan diagnosed Pettit with major depression and panic disorder with agoraphobia.

On March 21, 2007, Pettit's employment with Great River was terminated. Thereafter, on July 22, 2007, Pettit filed a claim with Unum for disability benefits under the Plan. Pettit

claimed that she was unable to work as a result of chronic allergies and specifically noted problems with Cidex exposure in her claim.

Dr. Boyd authored a letter in support of Pettit's claim for long-term disability benefits on September 6, 2007. In this letter, Dr. Boyd explained that, while he "would not consider himself a medical expert in allergies or disability," it was his opinion that Pettit "suffered a great deal with her acquired allergies which have made it nearly impossible for her to function in the work environment for which she is trained and experienced." A.R. 946.

Unum granted Pettit's application for disability benefits on December 6, 2007, under a Reservation of Rights, explaining that "payment cannot be construed as an admission of past, present or future liability and we reserve our right to enforce any and all provisions of the policy." A.R. 1009. Unum indicated that it was "in the process of obtaining additional infor-mation from [Great River] to determine if [Pettit's] lost time at work prior to March 21, 2007 was due to [her] medical condition or scheduling issues." Id. Unum also explained that its medical department was "in the process of reviewing the medical information in [Pettit's] claim file," and that Pettit would "be notified once the review is completed and the final determination has been made." Id. Thereafter, Pettit began to receive monthly benefit payments from Unum in the amount of $1,410.24.

On or about January 30, 2008, Lawrence Broda, M.D., an internist working as a medical consultant for Unum, attempted to contact Dr. Boyd by letter to discuss his interpretation of the available medical data concerning Pettit's claim. To gain a better understanding of Dr. Boyd's medical opinion regarding Pettit's claimed disability, Dr. Broda asked Dr. Boyd to explain (1) whether it would be reasonable for Pettit to avoid exposure to latex and Cidex; (2) whether Pettit would be able to work if she avoided Cidex exposure; (3) whether Pettit was impaired from asthma; (4) whether Pettit had undergone desensitization therapy for her allergic rhinitis; (5) whether Pettit was impaired as a result of behavioral health conditions based upon her

probable depression; and (6) whether Pettit would be impaired from her allergic rhinitis if not for her psychological conditions. Dr. Boyd responded by reiterating his opinion that Pettit suffered from "chronic allergies which have made it nearly impossible to function in a work environment where she is trained and experienced." A.R. 1186. Dr. Boyd also explained, "In regard to your assertion that her psychiatric problems are the cause of her health conditions I can only opine that it is difficult to separate these symptoms in real life." Id.

Dr. Broda also contacted Dr. Garrels on January 29, 2008, to gain a better understanding of his medical opinion regarding Pettit's claimed disability. In the summary of their conversation, Dr. Garrels reportedly stated that Pettit was "precluded from work due to severe allergic rhinitis." A.R. 1170. Dr. Garrels did not believe that Pettit had undergone desensitization therapy but indicated that if Pettit's condition were better controlled through such therapy, she would be able to return to work. When asked whether Pettit's "depression/anxiety might be a contributing factor in her perception of allergy difficulties," Dr. Garrels reportedly noted that he "had seen her only a few times but depression/anxiety are factors in her recovery." A.R. 1171.

Dr. Broda conducted a review of the available medical data concerning Pettit's claim on or about January 31, 2008. Following his review, Dr. Broda concluded that Pettit was not disabled as a result of her physical condition. In support of his conclusion, Dr. Broda explained that Pettit was capable of working in her previous job with avoidance of latex and Cidex, as it was reasonable to avoid these agents in her employment setting. Additionally, Dr. Broda disagreed with the restrictions imposed by Dr Garrels, noting that they were not medically supported, and that it would be reasonable for Pettit to avoid work in excessively dusty environments. Dr. Broda did conclude, however, based upon the available medical data, that Pettit's behavioral health issues were disabling.

On February 4, 2008, Unum informed Pettit by letter that it had removed "the Reservation of Rights that was applicable to [her] prior payments." A.R. 1158. Unum explained that it had

completed its review of the medical information in Pettit's file, and that it was approving Pettit's claim due to her conditions of "anxiety and panic disorder." A.R. 1158. Unum further advised that, under the terms of the Plan, payments for "disabilities due to mental illness and disabilities" were limited to twenty-four months. Id.[1] Pettit was deemed disabled as of March 21, 2007, under the Plan.

In April 2007, Pettit filed a disability claim with the Social Security Administration ("SSA"), alleging that she could no longer work due to chronic allergies and back pain. Pettit also noted that she suffered from severe panic attacks.

On May 10, 2007, Mary Greenfield, M.D., a medical consultant for the SSA, completed a functional capacity assessment as part of the SSA's evaluation of Pettit's claim for disability benefits. In this assessment, Dr. Greenfield concluded that Pettit had no limitations as a result of her allergies other than to avoid concentrated exposure to fumes, odors, and poorly ventilated areas, and all exposure to latex. Dr. Greenfield disagreed with Dr. Garrels' March 8, 2007, assessment regarding Pettit's limitations, explaining that Dr. Garrels' opinion should be "given less weight based on the presence of normal pulmonary function testing." A.R. 1448. The SSA subsequently denied Pettit's claim for benefits on October 16, 2007, finding that the medical

---

[1] The Plan provides as follows:

> The lifetime cumulative maximum benefit period for all disabilities due to **mental illness** and disabilities based primarily on **self-reported symptoms** is 24 months. Only 24 months of benefits will be paid for any combination of such disabilities even if the disabilities:
> -are not continuous; and/or
> -are not related.

A.R. 21 "Mental Illness" is defined as "a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a disability. Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or disorders relatable to stress." A.R. 36-37.

evidence did not support an award of disability benefits, and that Pettit "should be able to do work similar to [her] past work as a nurse's aide." A.R. 1524.

Pettit sought reconsideration of the SSA's findings following the denial of her claim for disability benefits. In addition to seeking benefits based upon her allergies and back pain, Pettit submitted information in support of a claim for benefits based upon mental impairments. The SSA subsequently affirmed its decision to deny Pettit benefits for any physical disability. The SSA determined that Pettit was disabled due to affective and anxiety disorders as of March 21, 2007, however, and began sending Pettit disability payments in September 2007.

The Plan gives Unum the right to reduce monthly disability benefits payable to a Plan participant by an amount the participant receives or is entitled to receive from the SSA for "the same disability." A.R. 18-19. On June 10, 2008, Unum informed Pettit by letter that it had learned of Pettit's SSA award. Unum advised Pettit that the Plan provided for a reduction of her monthly benefit "by any Social Security benefits paid for the same period," and that it was accordingly entitled to recuperate an $8,352.00 "overpayment" resulting from Pettit's receipt of long-term disability benefits, unreduced by her SSA award. A.R. 1285.[2] In response to this letter, Pettit issued Unum the requested payment for $8,352.00. Pettit thereafter began to receive a reduced monthly benefit payment of $366.24 for her disability.

On March 8, 2009, Unum informed Pettit that it had previously miscalculated her benefit payment based upon an 80-hour pay period, resulting in an overpayment of benefits in the amount of $4,792.32. Unum advised Pettit that it had discovered this miscalculation during an internal audit and review of her claim.[3] Pursuant to Plan language authorizing Unum to recover

---

[2] The Plan provides that Unum has the right to recover overpayments due to a participant's "receipt of deductible sources of income." A.R. 7.

[3] The Plan provides that disabled participants are entitled to payments equal to "60% of monthly earnings to a maximum benefit of $5,000." A.R. 4. Monthly earnings are defined as "gross monthly income from your Employer in effect just prior to your date of disability." A.R.

overpayments due to "any error [it] makes in processing a claim," Unum requested that Pettit reimburse Unum for the overpayment by April 18, 2009.

Pettit failed to reimburse Unum for the claimed overpayment by the date specified in Unum's March 8, 2009, letter. On May 4, 2009, Unum advised Pettit that it would "begin applying her full monthly benefit to the overpayment and refer her file to [Unum's] Recovery Unit to pursue full reimbursement." A.R. 1835. Unum thereafter withheld subsequent payments to Pettit in an effort to satisfy the balance resulting from the overpayment.[4]

Pettit appealed Unum's decision to withhold Pettit's entire monthly benefit on June 9, 2009, arguing that Unum had "miscalculated the benefit amount to which [she] was entitled." A.R. 1908. In addition, Pettit appealed Unum's determination that she had received an overpayment as a result of her receipt of social security disability benefits. On August 21, 2009, Unum upheld its determination that Pettit had received an overpayment entitling it to reimbursement. Unum explained the basis for its monthly benefit calculation in its decision and determined that the calculation of the overpayment and Pettit's basic monthly earnings was correct.

---

16. Gross monthly income is calculated by multiplying the participants bi-weekly salary by 26 weeks, and then dividing that number by 12.

In calculating Pettit's monthly benefit payment, Unum initially determined that Pettit was scheduled to work 36 hours per week, or 72 hours per pay period. The representative processing Pettit's claim calculated Pettit's gross monthly income based upon Pettit's scheduled hours despite recognition that Pettit was working less than the number of hours for which she was scheduled. Following its internal audit and review of Pettit's claim, Unum noticed a fluctuation in what Pettit earned per pay period and determined that Pettit's gross monthly income should have been calculated based upon the number of hours she actually worked in the month preceding her determined date of disability. Because Pettit had experience a reduction in the amount of hours she normally worked in the month preceding the onset of her disability, however, Unum determined that it was appropriate to average Pettit's hours over three months "to provide her with the best benefit possible." A.R. 2229. This yielded a monthly benefit payment of $907.31, representing 60% of Pettit's gross monthly income based upon a three-month average of 51.47 hours worked.

[4] The Plan provides for a minimum monthly payment of $100 or 10% of the participant's gross disability payment, whichever is greater. The minimum monthly payment may be applied "toward an outstanding overpayment," however. A.R. 19.

On September 30, 2009, Unum informed Pettit that the maximum benefits under the Mental Illness provision of the Plan had been paid as of September 17, 2009, and that her claim had been closed effective September 18, 2009. Pettit was further informed that she owed Unum $4,292.32 due to an overpayment of her claim.

On October 1, 2009, Pettit appealed Unum's determination that Pettit had received the maximum amount of benefits to which she was entitled. Pettit argued that she met the Plan's definition of physical disability based upon her allergies and the limitations associated therewith, and that she was accordingly entitled to long-term disability payments until the age of 65 under the terms of the Plan.[5] In support of her argument, Pettit cited to the medical opinions of Dr. Garrels and Dr. Boyd regarding her allergies and sensitivity to Cidex.

As part of the appeals process, Unum reviewed Pettit's medical records, including opinions offered by Dr. Garrels, Dr. Wegner-Keller, Dr. Boyd, Dr. Agarwal, and Dr. Szymula regarding Pettit's allergies and/or psychiatric disorders. In addition, Unum obtained medical records from Dr. Randal Hanson, M.D., a pulmonologist, Dr. Eli Goodman, a primary care physician who previously treated Pettit, Dr. Chelli, who also provided care to Pettit, and records from Pettit's Workers' Compensation and SSA claim files.

Dr. Hanson completed an Independent Medical Examination of Pettit for Workers' Compensation on November 8, 2007. In his report, Dr. Hanson noted normal pulmonary function testing and no evidence of reactive airways disease upon methacholine challenge testing. Dr. Hanson also reviewed a CT scan of Pettit's chest and sinuses, as well as x-rays of Pettit's chest, and determined that the tests were normal. Based upon his examination, Dr. Hanson opined that Pettit did not have "any significant respiratory illness" or "disability related to her pulmonary

_____

[5] The Plan provides that a participant will receive benefits "up to the **maximum period of payment**" which is determined based upon the participant's age. A.R. 20. For participants qualifying for disability benefits under the age of 60, such as Pettit, the maximum period of payment is "to age 65, but not less than 5 years." Id.

status." A.R. 1073. Dr. Hanson did recognize, however, that Pettit "has profound phobia and depression which may qualify her for disability." Id.

Dr. Goodman treated Pettit after she was hospitalized in Keokuk, Iowa, in March 2008 with diagnoses of major depression, recurrent panic attacks, agoraphobia, and personality disorder. During the course of his treatment, Dr. Goodman documented diagnoses of severe psychiatric disorder and multiple environmental allergens. On July 17, 2009, Dr. Goodman stated that Pettit was disabled but did not offer a diagnosis as the basis for his opinion. Dr. Goodman did indicate, however, that Pettit was in continuing psychiatric care.

Dr. Goodman left his office and was replaced by Dr. Chelli, who provided treatment to Pettit, primarily for "severe anxiety." A.R. 2360, 2295. After reviewing Pettit's medical records, Dr. Chelli reported on or about September 28, 2009, that she believed Pettit's anxiety was more debilitating than her physical conditions, and that Pettit was unable to function in a social setting.

Costas Lambrew, M.D., a board certified internist, conducted an appellate review of the available medical data concerning Pettit's claim on or about November 3, 2009. Following his review, Dr. Lambrew concluded that Pettit had "no physical limitations precluding work activity based on the medical evidence." A.R. 2372, 2360. Dr. Lambrew's opinion was consistent with the opinions of two other reviewing physicians, Gary P. Greenhood, M.D., and Nancy L. Heimonen, M.D., who concluded that Pettit's physical condition did not interfere with her ability to sustain all gainful employment. Dr. Lambrew further agreed with Dr. Chelli's assessment that Pettit's "primary debilitating condition is her mental health disease." A.R. 2360.

In addition to the foregoing, Nancy Munroe, Certified Rehabilitation Counselor and Global Career Development Facilitator, conducted a vocational assessment of Pettit's education, training, and experience on Unum's behalf to determine if Pettit would be capable of performing other occupations. On or about August 18, 2009, after reviewing Pettit's claim file, and taking

11

into account Pettit's former training, education, experience, strength level, and restrictions provided by Dr. Heimonen,[6] Ms. Munroe determined that Pettit "demonstrated sufficient educational levels to perform" the occupations of cashier, sales clerk, and gambling broker, occupations that were determined to exist in Pettit's geographic area. A.R. 2277-78.

Unum upheld its determination that Pettit was not physically disabled under the terms of the Plan on November 10, 2009. In a decision letter provided to Pettit, Unum summarized the medical evidence reviewed for purposes of Pettit's appeal and concluded that the appellate record did not "support restrictions and/or limitations related to any physical condition that would preclude Ms. Pettit from working." A.R. 2374.

Pettit filed this lawsuit on January 1, 2010. Pettit's complaint alleges that Unum wrongfully denied her claim for long-term disability benefits based upon her physical condition. Additionally, Pettit claims that Unum improperly reduced her monthly benefit payment to account for her SSA award and withheld benefits to which she is entitled due to a miscalculation of her monthly benefits. Pettit seeks reimbursement of and compensation for any and all benefits due as a result of her claimed disability. Unum has filed a counterclaim in this matter, seeking to recover its claimed overpayment of $4,292.32.

## II.     APPLICABLE LAW AND DISCUSSION

### A.  Standard of Review

Under ERISA, a plan participant may bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). For claims challenging the denial of benefits, the applicable standard of review is *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility

---

[6] Dr. Heimonen found no reason that Pettit could not "work in a well-ventilated environment with appropriate precautions to avoid latex and metal exposures." A.R. 2274.

for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). When an ERISA plan provides a plan fiduciary with discretion to interpret the terms of the plan and/or to determine eligibility for benefits, the fiduciary's decision regarding benefits is reviewed under an abuse of discretion standard. <u>Jones v. ReliaStar Life Ins. Co.</u>, 615 F.3d 941, 944 (8th Cir. 2010) (citing <u>Bruch</u>, 489 U.S. at 115).

Under the abuse of discretion standard, a plan fiduciary's interpretation of uncertain terms in a plan "will not be disturbed if reasonable." <u>King v. Hartford Life and Acc. Ins. Co.</u>, 414 F.3d 994, 999 (8th Cir. 2005) (quoting <u>Bruch</u>, 489 U.S. at 111). In determining whether a plan fiduciary's interpretation is reasonable, a court considers (1) whether the interpretation is consistent with the goals of the plan; (2) whether the interpretation renders any language of the plan meaningless or inconsistent; (3) whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the words at issue have been interpreted consistently; and (5) whether the interpretation is contrary to the clear language of the plan. <u>Id.</u> (citations omitted). These factors, commonly referred to as the <u>Finley</u> factors,[7] inform the court's analysis, "but [t]he dispositive principle remains . . . that where plan fiduciaries have offered 'a reasonable interpretation' of disputed provisions, courts may not replace [it] with an interpretation of their own-and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination." <u>Id.</u> (citing <u>de Nobel v. Vitro Corp.</u>, 885 F.2d 1180, 1188 (alteration in original).

In evaluating whether a plan fiduciary's fact based determinations are reasonable under an abuse of discretion standard, the Court must decide whether the fiduciary's decision was "supported by substantial evidence. Substantial evidence means 'more than a scintilla but less than a preponderance.'" <u>Darvell v. Life Ins. Co. of N. Am.</u>, 597 F.3d 929, 934 (8th Cir. 2010)

_____

[7] The five-factor analysis was first outlined in <u>Finley v. Special Agents Mutual Benefit Ass'n, Inc.</u>, 957 F.2d 617 (8th Cir. 1992).

(quoting <u>Wakkinen v. UNUM Life Ins. Co. of Am.</u>, 531 F.3d 575, 580 (8th Cir. 2008)).  A decision will be deemed reasonable "if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision.'" <u>Midgett v. Wash. Group Int'l Long Term Disability Plan</u>, 561 F.3d 887, 897 (8th Cir. 2009) (quoting <u>Jackson v. Metro. Life Ins. Co.</u>, 303 F.3d 884, 887 (8th Cir. 2002)).

In addition to the foregoing, when reviewing a plan fiduciary's decision to deny benefits, the Court must focus on the evidence available to the plan fiduciary at the time of the decision and "may not admit new evidence or consider *post hoc* rationales."  <u>King</u>, 414 F.3d at 999. "Courts reviewing a plan administrator's decision to deny benefits will review only the final claims decision, <u>Galman v. Prudential Ins. Co. of Am.</u>, 254 F.3d 768, 770-71 (8th Cir. 2001), and not the 'initial, often succinct denial letters,' in order to ensure the development of a complete record."  <u>Khoury v. Group Health Plan, Inc.</u>, 615 F.3d 946, 952 (8th Cir. 2010) (quoting <u>Wert v. Liberty Life Assurance Co. of Boston</u>, 447 F.3d 1060, 1066 (8th Cir. 2006).

In the present case, the Plan designates Unum as a claims fiduciary, providing that Unum, as the administrator's designee, "has discretionary authority to determine . . . eligibility for benefits and to interpret the terms and provisions of the [Plan]."  A.R. 11, 34.  The Plan further provides that

> the Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) will have the broadest discretion permissible under ERISA and any other applicable laws, and its decision will constitute final review of your claim by the Plan.  Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum), decides in its discretion that the applicant is entitled to them.

A.R. 34.  The Eighth Circuit has held that discretionary review of a claim decision is appropriate when presented with identical policy language.  <u>See</u> <u>Wakkinen</u>, 531 F.3d at 580-81.  Accordingly, the Court must review Unum's decision for an abuse of discretion.[8]

---

[8] Pettit argues that because Unum is not the Plan administrator and "was not truly delegated with the 'discretionary authority to determine [her] eligibility or to construe the terms of

## B. Conflict of Interest

Pettit argues that a less deferential standard of review is appropriate in this case because Unum rendered its decision while operating under a conflict of interest. In Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008), "the Supreme Court determined specifically that when the entity that administers the plan 'both determines whether an employee is eligible for benefits and pays benefits out of its own pocket' a conflict of interest exists." Chronister v. Unum Life Ins. Co. of Am. 563 F.3d 773, 775-776 (8th Cir. 2009). This conflict of interest, however, does not alter the standard of review to be applied by the Court. Id. at 776. Rather, the conflict is merely a factor the Court must consider in determining whether the insurer abused its discretion. Jones, 615 F.3d at 944.

Under Glenn, an insurer's "conflict of interest can 'act as a tiebreaker' when the issue is close and can assume 'great importance' 'where circumstances suggest a higher likelihood that it affected the benefits decision.'" Id. (quoting Glenn, 554 U.S. at 117).

> Such circumstances include cases where there is "a history of biased claims administration" or there is evidence of "procedural unreasonabilities." But where "the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision[-]making irrespective of whom the inaccuracy benefits," the reviewing court will place less importance on the conflict.

Anderson v. Nationwide Mut. Ins. Co., 592 F. Supp. 2d 1113, 1126 (S.D. Iowa 2009) (quoting Glenn, 554 U.S. at 117) (internal citation omitted). In the absence of evidence regarding an insurer's claims administration history and efforts "to reduce potential bias and to promote accuracy," courts are required to "give the conflict some weight, but the existence of the conflict alone is not determinative." Khoury, 615 F.3d at 954 (citing Glenn, 554 U.S. at 118); Darvell, 597 F.3d at 934.

---

[her] plan," the Court must evaluate Unum's decision *de novo.* Pl's Br. 10. The Wakkinen v. UNUM Life Insurance Co, of America decision renders Pettit's argument in this regard without merit. Wakkinen, 531 F.3d at 580-81.

In the present case, Unum concedes that it both evaluates and pays benefits for claims under the Plan. As a result, an inherent conflict of interest must be recognized. However, "[a]side from the history of the claim at issue here, the record contains no evidence of [Unum's] claims administration history or its efforts 'to reduce potential bias and to promote accuracy.'" <u>Khoury</u>, 615 F.3d at 954. Accordingly, the Court must give Unum's conflict of interest some weight. <u>Id.</u> The impact this conflict has on the Court's decision will be addressed in the course of this order.

### C. Claim For Benefits During the First Twenty-Four Months of Payments Under the Plan

Pettit contends that Unum erred in concluding that she was not disabled as a result of her allergies under the Plan's definition of disability governing the first twenty-four months of benefit payments. Pettit argues that Unum's decision to award benefits based solely on her mental condition was unreasonable in light of the medical evidence at issue in this case. In addition, Pettit asserts that Unum's conflict of interest affected the decision to deny benefits for her physical condition because Unum had an interest in limiting its liability exposure.[9] Pettit contends that this Court should find Unum abused its discretion in denying benefits for her physical condition as a result.

In response to Pettit's arguments, Unum asserts that whether Pettit was physically disabled as a result of her allergies during the first twenty-four months of payments under the Plan is irrelevant for purposes of the Court's review. Unum maintains that this is so because Pettit received the maximum amount of benefits for which she was entitled during this time period and must now satisfy the more stringent definition of disability provided for in the Plan. Under this definition, Pettit must demonstrate that she is "unable to perform the duties of any **gainful**

---

[9] As Pettit correctly identifies, under the terms of the Plan, the "cumulative maximum benefit period" for disabilities due to mental illness is of twenty-four months. <u>See</u> A.R. 21. If Pettit were found to be physically disabled, however, she would be entitled to benefits for a minimum of five years and at maximum until she reached the age of 65.

**occupation"** for which she is "reasonably fitted by education, training or experience" due to her sickness or injury. A.R. 15. Unum argues that Pettit cannot meet this definition, and that its decision should consequently be upheld.

In responding to Unum's argument, "Pettit does not deny that, going forward, she would need to meet the increased definition of 'disabled' which accompanies the receipt of LTD benefits beyond two years." Pl.'s Reply Br. 2. Pettit asserts, however, that her "current claim is for *past due* benefits – unreduced by her [social security disability income] – under the authority of the policy for the *first twenty-four months*." Id.[10] Whether she was disabled as a result of her allergies for the first twenty-four months of benefit payments is relevant, according to Pettit, because the Plan provides for a reduction in monthly benefit payments only by the amount of SSA benefits payable for the "same disability." A.R. 19. Because Pettit believes that Unum should have awarded her benefits based upon her physical condition, she argues that the offset in monthly benefit payments to account for her SSA benefits, payable for her mental illness, was improper.

The propriety of Unum's decision to offset Pettit's benefits by her SSA payments must be analyzed, at the outset, by determining whether Unum's interpretation of the Plan language providing for the offset is reasonable. This is so because Unum interprets the "same disability" language referenced by Pettit to refer to the "same period of disability," rather than the same diagnosis, illness, or injury. See A.R. 1285; Def.'s Br. 20-21. The record in this case indicates that Pettit receives SSA benefits due to affective and anxiety disorders with a determined onset date of March 21, 2007. Accordingly, if Unum's interpretation of the "same disability" language is reasonable, then Unum is entitled to offset Pettit's monthly benefit to account for her SSA award regardless of whether Pettit's disability is characterized as physical or mental in nature.

---

[10] Pettit specifically states in her complaint that she is seeking "an award of partial LTD benefits from the date of first payment to September 17, 2009, congruent with the amount [her] LTD payments were offset by her SSA benefits." Compl. 6.

Unum cites to <u>Campos v. Mutual of Omaha Insurance Co.</u>, 23 F. App'x 614 (8th Cir. 2001), and <u>Bacquie v. Liberty Mutual Insurance Co.</u>, 435 F. Supp. 318 (S.D.N.Y. 2006), <u>aff'd.</u>, 247 F. App'x 296 (2d Cir. 2007) (unpublished per curiam), in arguing that its interpretation of the Plan language at issue is reasonable.  In <u>Campos</u>, the Eighth Circuit was called upon to decide whether the administrator of an ERISA plan abused its discretion by offsetting the plaintiff's "plan benefits by the amount of her social security disability benefits."  <u>Campos</u>, 23 F.. App'x at 615.  The plan in <u>Campos</u> authorized the offset only if benefits received from the SSA were payable for the "same disability."  <u>Id.</u>  In addressing the propriety of the administrator's decision, the court found that the administrator had reasonably interpreted the phrase "same disability' to mean 'based upon the same period . . . and cause of disability,' and not 'based upon the same medical diagnosis, . . . ."  <u>Id.</u>

In <u>Bacquie</u>, the plaintiff was initially awarded disability benefits under an ERISA plan for her mental illness.  <u>Bacquie</u>, 435 F. Supp. 2d at 323.  The plaintiff's disabling condition was later reclassified, however, as Systemic Lupus Erythematosus, a physical condition.  <u>Id.</u>  Prior to the reclassification, the plaintiff was awarded social security benefits based on schizophrenia and anxiety disorder.  <u>Id.</u>  The plan administrator reduced the plaintiff's benefits based on the SSA award, concluding that the SSA benefits were paid for the "same disability," as authorized by relevant plan language.  <u>Id.</u>

The plaintiff challenged the administrator's decision in <u>Bacquie</u>, arguing that the phrase "same disability" should be "interpreted as synonymous with 'diagnosis.'"  <u>Id.</u> at 328.  In declining to find that the administrator abused its discretion in offsetting the plaintiff's disability payments, the court explained,

> Liberty does not interpret "same Disability" to mean the same diagnosis, but rather the concurrence of the time periods during which the several ailments render the Plan participant unable to work.  While we are sympathetic to plaintiff's plight, we are inclined to agree with defendants.
>
> As defined by the Plan, "Disability" means, in pertinent part, that "the Covered Person is unable to perform all of the material and substantial duties of his

occupation on an Active Employment basis because of an Injury or Sickness." It is clear to the Court that "Disability" refers to the effect, *i.e.,* the inability to sustain employment, rather than the cause, *i.e.,* the specific condition preventing employability. Indeed, other than as relates to determining successive periods of disability, nowhere in the Plan or the SPD is receipt of benefits contingent on an individual's "sickness." Rather, it is this inability to work that entitles the Plan participant to receive disability income. The phrase "same Disability" is used to limit the potential offset attributed to other sources of income – here SSDI benefits – to a defined period of disability, regardless of how many or few separate medical conditions render the covered person unable to work. By refusing to equate disability with diagnosis, Liberty prevents Plan participants from receiving benefits in excess of their contractual entitlement by recovering benefits from Liberty for one "sickness" and then again from the SSA for another "sickness" that disabled the insured during the same period.

Id.[11] At least one other district court has reached a similar conclusion. See Sanders v. Unum Life Ins. Co. of Am., No. SA-06-CQA-514-FB, 2007 WL 2751892, 12 (W.D. Tex. June 21, 2007) ("the language 'same disability' means the same inability to work rather than the same injury or illness.").

The Court finds the foregoing authority persuasive and similarly concludes that Unum's interpretation of the "same disability" language is reasonable. The Plan defines "disabled," during the first twenty-four months of payments, to mean that a participant is "limited from performing the **material and substantial duties** of [her] **regular occupation** due to [her] **sickness** or **injury**" and has a "20% or more loss in [her] **indexed monthly earnings** due to the same sickness or injury." A.R. 15. In this context, "disabled" refers "to the effect, *i.e.,* the inability to sustain employment, rather than the cause, *i.e.,* the specific condition preventing employability." Bacquie, 435 F. Supp. 2d at 328. A participant receives benefits under the Plan because of the inability to work and the loss of earnings associated therewith, not because of a

---

[11] On appeal, the Second Circuit found that the administrator's interpretation of the "same disability" language was "unquestionably" reasonable. Bacquie v. Liberty Mut. Ins. Co., 247 F. App'x 296, 298 (2d Cir. 2007) (unpublished per curiam),. The court explained, "Same' in this context refers to the same time period of disability. The offset provision would not apply in a case where the period of time an employee was unable to work differs from the period of time for which that employee was awarded disability benefits from Social Security." Id.

diagnosis based upon a specific illness or injury.  Accordingly, it is reasonable for Unum to interpret "same" as referring to the same time period of disability rather than the same diagnosis, sickness, or injury.  Id.

An analysis of the five <u>Finley</u> factors discussed *supra* confirms that Unum's interpretation of the Plan language is reasonable.  <u>See</u> <u>King</u>, 414 F.3d at 999 (discussing the five factors). Under the first factor, the Court must consider whether Unum's interpretation of the Plan language is consistent with the goals of the Plan.  Here, the central purpose of the Plan is to provide protection to participants by paying them a portion of their income while they are disabled.  As was the case in <u>Bacquie</u>, Unum's refusal "to equate disability with diagnosis . . . prevents Plan participants from receiving benefits in excess of their contractual entitlement by recovering benefits from [Unum] for one 'sickness' and then again from the SSA for another 'sickness' that disabled the insured during the same period."  <u>Bacquie</u>, 435 F. Supp. 2d at 328. The Plan's protective function serves only to *replace* income lost due to a participant's disability.  This function would be undermined if a participant could receive more in disability than earned while working.  Unum's interpretation prevents this result and furthers the Plan's purpose.

With regard to the remaining <u>Finley</u> factors, the Court must consider (1) whether Unum's interpretation renders any language of the Plan meaningless or internally inconsistent; (2) whether the Plan language has been interpreted consistently; (3) whether the interpretation is contrary to the clear language of the Plan; and (4) whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute.  <u>King</u>, 414 F.3d at 999.  Here, the Court is unable to identify any language in the Plan that would be rendered meaningless or inconsistent by Unum's interpretation of the Plan language at issue.  There likewise is no indication that Unum has failed to consistently interpret the relevant terms of the Plan or that its interpretation is otherwise contrary to the Plan's clear language.  In addition, because the Eighth Circuit has previously recognized that a reduction in disability payments to account for SSA awards "is permitted by ERISA," this Court is unable to find that Unum's interpretation in any

way conflicts with ERISA's requirements.  See Brandis v. Kaiser Aluminum & Chem. Corp., 47 F.3d 947, 950 (8th Cir. 1995) (citing Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 514-17 (1981).  An evaluation of the Finley factors therefore supports Unum's interpretation of the Plan.

Pettit contends that the Court should reject the reasoning employed in Bacquie and follow the court's rational in Gruber v. Unum Life Insurance Co. of America, 195 F. Supp. 2d 711 (D. Md. 2002).  In Gruber, the court appeared to construe plan language permitting an offset for SSA benefits payable for the "same disability" as requiring that the SSA benefits be awarded for the same illness or injury.  Id. at 719.  The plaintiff in Gruber had received disability benefits under an ERISA  plan for depression and post-traumatic stress disorder.  Gruber, 195 F. Supp. 2d at 718.  The plaintiff was later awarded SSA benefits after she was found to be impaired by "systematic lupus erythematosus with headaches, residual effects from a neck injury with shoulder pain and headaches, post-traumatic stress disorder and depression, and arthritis."  Id. at 719.  The court concluded that an offset in the plaintiff's benefits to account for the SSA award was improper because it was ambiguous as to whether the SSA awarded benefits based upon the plaintiff's mental disorders in addition to her physical ailments.  Id. at 719.  The court construed this ambiguity in favor of the plaintiff and found that her SSA benefits were not payable for the same disability for which she received benefits under the plan.  Id.

Gruber is readily distinguishable from the case at hand.  In Gruber, Unum, for reasons that are not apparent, did not advance the plan interpretation at issue here.  Id.  Rather, Unum argued that the offset was proper under the plan because the SSA considered and included the plaintiff's "depression and/or post-traumatic stress disorder in making [its] award."  Id.  This is significant because under the abuse of discretion standard applied in this case, the Court must give defer-ence to Unum's reasonable interpretation of relevant Plan language.  King, 414 F.3d at 999.  The Gruber court applied federal common law in interpreting the plan provision at issue, construing ambiguities in the plan against the insurer and in favor of the insured.  Id. (citing Todd v. AIG Life Ins. Co., 47 F.3d 1448, 1451-52 (5th Cir. 1995).  In the Eighth Circuit, "the common law rule of construction that ambiguous language in an insurance policy is construed against the

insurer has no place in the construction of an ERISA plan," <u>Bernards v. United of Omaha Life Ins. Co.</u>, 987 F.2d 486, 488 n.1 (8th Cir. 1993) (citing <u>Finley v. Special Agents Mut. Ben. Ass'n, Inc.</u>, 957 F.2d 617, 619 (8th Cir. 1992)).[12]  This is particularly true where the standard of review is for an abuse of discretion.  <u>See</u> <u>King</u>, 414 F.3d at 998-99 ("while a court may develop the 'federal common law' of ERISA to interpret a benefit plan in a case governed by *de novo* review, an administrator with discretion under a plan to construe uncertain terms is not bound by this same interpretation, so long as the administrator adopts an interpretation that is 'reason-able.'").  <u>Gruber</u> is therefore not instructive.

Based upon the foregoing, the Court readily concludes that Unum's interpretation of the Plan language is reasonable generally and within the context of this case.  Additionally, while the Court has considered Unum's conflict of interest in reviewing Unum's interpretation of the Plan, it does not consider the issue before it to be a close one where the conflict is capable of tipping the balance in Pettit's favor.  <u>See</u> <u>Jones</u>, 615 F.3d at 946.  Because Unum is entitled to offset Pettit's monthly benefit payments by an amount equal to her SSA benefits paid for the *same time period of disability*, the Court upholds Unum's offset determination and declines to address whether the record supports an award of benefits during the first twenty-four months of payments for Pettit's physical condition.

**D.  Claim for Benefits Following the First Twenty-Four Months of Payments Under the Plan**

The Plan requires that participants provide satisfactory proof of disability when submitting a claim for benefits.  To qualify for continued benefits after twenty-four months of payments, participants must demonstrate that they are "unable to perform the duties of any **gainful occu-pation"** for which they are "reasonably fitted by education, training or experience" due to a sickness or injury.  A.R. 15.  In challenging Unum's appeal decision, Pettit argues that Unum

---

[12] An exception exists when, "after applying ordinary principles of construction, [and] giving language its ordinary meaning and admitting extrinsic evidence, ambiguities remain." <u>Delk v. Durham Life Ins. Co.</u>, 959 F.2d 104, 106 (8th Cir. 1992).

failed to conduct a full and fair review of her claim for disability benefits by disregarding relevant medical evidence submitted in support of her claim. As a result, Pettit requests that the Court remand her claim to Unum "for re-opening of the record and for a full and fair review as to whether she is entitled to receive LTD benefits under Unum's post-24 month definition of 'disabled.'" Pl.'s Reply Br. 5 (internal citation omitted).

### 1. Full and Fair Review

ERISA requires that benefit plans "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). This entails "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). A plan fiduciary therefore abuses its discretion when it "ignore[s] relevant medical evidence in the records before it." Anderson, 592 F. Supp. 2d at 1130 (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003)).

Pettit focuses on the opinions of Dr. Boyd and Dr. Garrels in arguing that Unum abused its discretion by ignoring relevant medical evidence.[13] Pettit contends that Unum failed to consider restrictions imposed by Dr. Garrels to avoid "exposure to all chemicals, mist, vapors, and odors,"

---

[13] Pettit also relies on an opinion rendered by Carlyle Voss, M.D., a psychiatrist hired by Unum to evaluate Pettit's mental condition, in arguing that Unum ignored relevant medical evidence. Specifically, Pettit focuses on Dr. Voss assessment that

> Ms. Pettit was terminated due to her missing work secondary to her allergies and restrictions. She did not leave work due to depression or panic attacks. Symptoms of depression and panic attacks increased near the end of her employment due to her concerns about her health and concerns about losing her position, which happened.

A.R. 1060.

Dr. Voss's opinion, while relevant to the issue of whether Pettit suffers from a mental impairment, is not relevant to the issue of whether Pettit qualifies for benefits for her physical condition under the Plan's post twenty-four month definition of disabled, as the opinion does not address whether Pettit's physical condition precludes her from any gainful occupation for which she is reasonably suited by education, training, or experience.

A.R. 286, and his statement to Dr. Broda that Pettit was "precluded from work due to severe allergic rhinitis." A.R. 1170. Additionally, Pettit claims that Unum failed to consider or improperly rejected Dr. Boyd's conclusion that Pettit's "chronic allergies . . . made it nearly impossible to function in a work environment where she is trained and experienced." A.R. 1186. The Court cannot agree.

A review of Unum's appeal decision reveals that Unum considered Dr. Garrels' opinion,[14] including his recommended restrictions, but did not credit his opinion given conflicting medical evidence in the record. In denying Pettit's claim for benefits, Unum accepted the opinion of Dr. Greenfield, who, after conducting a functional capacity assessment on behalf of the SSA, disagreed with Dr. Garrels' opinion regarding Pettit's restrictions and limitations. In contrast to Dr. Garrels' opinion, Dr. Greenfield concluded that Pettit should avoid only *concentrated* exposure to fumes, odors, and poorly ventilated areas, and all exposure to latex due to her allergies. A.R. 1445, 1448. This opinion served as the basis for the SSA's determination that Pettit was not precluded from working due to her allergies, a determination that factored into Unum's ultimate decision to deny benefits for Pettit's physical condition.

A plan fiduciary does not abuse its discretion when it accepts the opinion of a reviewing physician over the conflicting opinion of a treating physician "unless the record does not support the denial." Midgett, 561 F.3d at 897 (citing Dillard's Inc. v. Liberty Life Assur. Co. of Boston, 456 F.3d 894, 899 (8th Cir. 2006)). The record in this case demonstrates that Dr. Greenfield formulated her opinion based, in part, on the results of normal pulmonary function tests administered to Pettit. An objective basis therefore existed for Dr. Greenfield to discredit the

---

[14] In its appeal decision, Unum summarized Dr. Garrels' conversation with Dr. Broda on January 29, 2008, noting that Dr. Garrels "was not aware that [Pettit] had undergone desensitization for her allergies, and agreed that *if she were to do so, she could return to work*." A.R. 2372 (emphasis added). Implicit in this statement is Unum's acknowledgment of Dr. Garrels' belief that Pettit was precluded from work due to her allergies, at least until her condition was better controlled through desensitization therapy.

restrictions imposed by Dr. Garrels. While it is true that Dr. Garrels treated Pettit on several occasions, his opinion regarding Pettit's restrictions and limitations appears to have been based primarily on Pettit's subjective complaints; specifically that "almost everything she does," "just anything that results in exposure to dust, mist, vapor, chemical, or odor," causes her "some difficulties with exposure." A.R. 286.[15] A plan fiduciary does not abuse its discretion by rejecting the opinion of a physician who fails to "provide[ ] reliable objective evidence of testing or other proof to support the finding of long term disability." See Darvell, 597 F.3d at 935 (citing McGee v. Reliance Standard Life Ins. Co., 360 F.3d 921, 924-25 (8th Cir. 2004)). Unum's acceptance of Dr. Greenfield's opinion over the opinion rendered by Dr. Garrels was therefore not an abuse of discretion in light of the record evidence.

In addition to the foregoing, the record also demonstrates that Unum considered and rejected Dr. Boyd's opinion regarding Pettit's disability in favor of conflicting medical evidence. In discrediting Dr. Boyd's conclusions regarding Pettit's inability to work, Unum cited to the opinion of Dr. Lambrew and the SSA's findings pertaining to Pettit's claim for SSA benefits. Dr. Lambrew's opinion that Pettit had "no physical limitations precluding work activity" was consistent with the opinions of Dr. Greenhood and Dr. Heimonen, who concluded that Pettit's physical condition did not interfere with her ability to sustain all gainful employment. A.R. 2258, 2266. The SSA similarly concluded that Pettit was capable of doing "work similar to [her] past work as a nurse's aide" based upon Dr. Greenfield's functional assessment. A.R. 1524.

Unlike the opinions of Unum's reviewing physicians and the SSA's disability determination, it is unclear from a reading of Dr. Boyd's opinion whether his assessment regarding Pettit's

---

[15] Dr. Garrels did review the medical records of Dr. Agarwal, Dr. Wegner-Keller, and Dr. Boyd prior to imposing the avoidance restrictions at issue. Those records documented contact metal sensitivity, Cidex intolerance, and allergies to latex, dust, cats, and ragweed. No restrictions were imposed by any of the foregoing physicians, however, other than to avoid exposure to Cidex and latex at the time.

ability to work relates to Pettit's previous work in a medical setting or to *any* gainful employment. Dr. Boyd's opinion states only that Pettit suffers from "acquired allergies which have made it nearly impossible for her to function in the work environment for which she is trained and experienced." A.R. 946. The Plan's relevant definition of "disabled," however, requires that Pettit be precluded from *any* gainful occupation for which she is "reasonably fitted by education, training or experience" before she qualifies for disability benefits. A.R. 15. In light of this fact, and considering Dr. Boyd's concession that he did "not consider himself a medical expert in allergies or disability," A.R. 946, Unum's rejection of Dr. Boyd's opinion in favor of the conflicting medical evidence demonstrating that Pettit had some capacity to work was not an abuse of discretion.

Because Pettit has not demonstrated that Unum failed to afford her a full and fair review of her claim on the grounds alleged, remand to Unum for a re-opening of the record and determination as to whether Pettit qualifies for benefits under the Plan's post twenty-four month definition of "disabled" is inappropriate. Unum has already rendered its decision on Pettit's entitlement to benefits under the definition of "disabled" at issue, and that decision is now final. Accordingly, the Court proceeds to determine wether Unum's decision is supported by substantial evidence in the record.

### 2. Substantial Evidence

In denying Pettit's claim for benefits based upon her physical condition, Unum relied, in part, on the opinions of Dr. Lambrew and Dr. Hanson, and the SSA's prior disability determination, including the medical opinion of Dr. Greenfield. Both Dr. Lambrew and the SSA (based upon Dr. Greenfield's functional assessment) concluded that Pettit was not precluded from working due to her allergies. Dr. Hanson concluded that Pettit did not have "any significant respiratory illness" or "disability related to her pulmonary status." A.R. 1073.

In addition to the aforementioned medical opinions, the vocational assessment performed by Nancy Munroe on or about August 18, 2009, determined that Pettit could perform the occupations of cashier, sales clerk, and gambling broker consistent with restrictions recommended by Dr. Heimonen to avoid latex and metal exposures and to work in well-ventilated environments. Dr. Heimonen opined that Pettit's physical condition did not preclude her from all gainful employment. This position was endorsed by Dr. Goodman, who concluded that Pettit was capable of working with avoidance of agents to which she reacts adversely.

A reasonable person could accept the foregoing evidence as adequate to support the conclusion that Pettit's physical condition did not preclude her from all gainful employment for which she is reasonably fitted by education, training, or experience. The presence of some conflicting evidence in the record does not alter this conclusion. See Midgett, 561 F.3d at 898. Substantial evidence therefore supports the decision to deny benefits.

### 3. Conflict of Interest Affecting the Appeal Decision

Pettit maintains that Unum abused its discretion in denying benefits for her physical condition because Unum's conflict of interest impacted the decision on her claim. Pettit cites to evidence of alleged procedural irregularities in the record that she contends supports her position.

First, Pettit argues that evidence in the record supports the conclusion that Unum initially determined that she was disabled as a result of her physical condition, but later retracted this position for the self serving-purpose of limiting its liability exposure. In advancing this argument, Pettit focuses on notations made by an Unum claims representatives in the claim file such as "it appears that impairment may be supported as the claimant continues to have ongoing symptoms even though she is no longer exposed to the chemicals at work." A.R. 996. Pettit contends that these notations are inconsistent with Unum's later position, espoused in the

February 4, 2008, letter lifting the reservation of rights, that Pettit was disabled only by her mental illness.

Even if the Court were to conclude that Unum initially adopted a position inconsistent with its determination that Pettit was disabled only by her mental illness, this finding would not impact the Court's decision in this matter. A determination that Pettit was disabled as a result of her allergies prior to February 4, 2008, would have been made under the Plan's definition of "disabled" governing the first twenty-four months of payments, and not the stricter definition presently at issue. In reviewing Unum's decision to deny benefits based upon Pettit's physical condition, the Court must focus on the final claims decision rendered on appeal to ensure the development of a complete record. Khoury, 615 F.3d at 952. Unum's final decision, issued by a separate appeals specialist, involved a different set of considerations under the post twenty-four month definition of "disabled," including additional medical evidence, which renders any benefit determination made prior to February 4, 2008, irrelevant for purposes of the Court's review.

Pettit also argues that the "vague character of [Unum's] initial "mental" disability award and the complete lack of medical evidence in support thereof 'gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or [Unum's] whim.'" Pl.'s Br. 15 (citing Layes v. Mead Corp., 132 F.3d 1246, 1250 (8th Cir. 1998). In addressing this argument, however, the Court must reiterate that its review is limited to Unum's final decision on appeal and does not concern the initial benefit determination referenced by Pettit. Khoury, 615 F.3d at 952 (quoting Wert, 447 F.3d at 1066). Unum's failure to cite to medical evidence supporting its mental disability determination, as set forth in the February 4, 2008, letter approving Pettit's claim, is therefore irrelevant. Id. In any event, sufficient evidence in the record exists to support Unum's *final* determination that Pettit's mental illness was disabling.[16]

---

[16] For example, Dr. Szymula documented that Pettit was "having severe problems at work related to depression and anxiety" and diagnosed Pettit with major depressive disorder and panic

The existence of substantial evidence supporting the mental disability determination eliminates any inference that Unum awarded benefits based upon Pettit's mental condition with the sole purpose of limiting its liability exposure.

As a final matter, Pettit argues that Unum's acceptance of medical opinions rendered by its reviewing physicians, and rejection of contrary opinions offered by her treating physicians, demonstrates that Unum's conflict of interest tainted the benefits decision. See Glenn, 554 U.S. at 118. As previously discussed, however, a reasonable basis existed for Unum to reject the opinions of Pettit's treating physicians in favor of conflicting medical evidence supporting the denial of benefits. The Court therefore declines to find that Unum's credibility determinations are indicative of a decision to deny benefits for the purpose limiting Unum's liability exposure. Additionally, Unum's reliance on the SSA's decision regarding Pettit's claim for benefits, made prior to and independently of Unum's final decision, reduces the likelihood that Unum's conflict of interest affected the decision on Pettit's claim.[17]

In light of the above findings, the circumstances of this case do not suggest a high likelihood that Unum's conflict of interest affected the decision to deny benefits under the relevant definition of "disabled" provided for in the Plan. As a result, even if the Court were to conclude that the issue of whether Unum abused its discretion in denying benefits was a close one, the tiebreaker conflict of interest analysis under Glenn would not itself support an abuse of discretion finding. See Hackett v. Standard Ins. Co., 559 F.3d 825, 829 (8th Cir. 2009). Because the

---

disorder. A.R. 1435-36. Dr. Strayhan noted that Pettit was experiencing almost constant anxiety with panic attacks that made her fearful to leave home and diagnosed Pettit with major depression and panic disorder with agoraphobia. On or about September 28, 2009, Dr. Chelli opined that Pettit's mental condition rendered her unable to function in a social setting, and that her condition was disabling. Dr. Lambrew agreed with Dr. Chelli's assessment.

[17] Pettit criticizes Unum's reliance on the SSA's decision by noting that this decision was rendered subsequent to Unum's *initial* benefit determination. This fact is of no consequence for purposes of the Court's analysis, however, as the Court's review is limited to Unum's *final* decision on appeal. Khoury, 615 F.3d at 952.

record demonstrates that Unum afforded Pettit a full and fair review of her claim, and because substantial evidence supports Unum's decision to deny benefits under the definition of "disabled" presently at issue, the Court concludes that Unum's denial of benefits was not an abuse of discretion.

### E.  Calculation of Benefit Payments

The Plan provides that disabled participants are entitled to monthly benefit payments equal to "60% of [their] monthly earnings."  A.R. 4.  "Monthly earnings" are defined as "gross monthly income from your Employer in effect just prior to your date of disability."  A.R. 16. Pettit argues that Unum improperly calculated her monthly earnings based upon the number of hours she actually worked, as opposed to the number of hours she was scheduled to work.  As a result, Pettit asserts that Unum failed to pay her the appropriate amount of benefits to which she was entitled under the authority of the Plan governing the first twenty-four months of payments.

The propriety of Unum's benefit calculation hinges on the meaning of the term "gross monthly income."  This term is not defined in the Plan.  Unum interprets "gross monthly income," however, to mean income actually received from an employer in the month preceding the determined date of disability, rather than income an employee could have received had they worked the maximum number of hours for which they were scheduled.  Unum notes that in Pettit's case, her "income" was directly related to the number of hours she actually worked.  As a result, Unum asserts that its benefit calculation was proper and should be upheld.

The Court addresses this dispute by employing the five-factor <u>Finley</u> test.  <u>King</u>, 414 F.3d at 999.  Under the first factor, the Court considers whether Unum's interpretation is consistent with the goals of the Plan.  Pettit asserts that Unum's interpretation, if given effect, "would defy principles of fairness and equity . . . [by] punishing insured individuals for absences accumulated while suffering from a disability."  Pl.'s Br. 34.  This argument, however, ignores the fact that

participants may receive benefits under the Plan during a time that they are working and experiencing a reduction in income due to a disabling sickness or injury. An employee's determined date of disability is the critical factor deciding whether the employee will receive compensation under the Plan in such a situation. In Pettit's case, her determined date of disability was March 21, 2007, the day her employment with Great River ceased. Pettit does not contest this finding in this action.

As previously indicated, the purpose of the Plan is to provide protection to participants by paying them a portion of their income while they are disabled. The Plan's definition of "monthly earnings" clarifies that the portion of income to be received by a participant will be calculated based upon monthly income in effect "just prior to [the] date of disability." A.R. 16. In the present case, Pettit's gross monthly income was related directly to the number of hours she actually worked; she was not compensated for scheduled but unworked hours. Unum's interpretation of "gross monthly income," applied to the facts of this case, was therefore consistent with the goals of the Plan, as Pettit received benefits accounting only for a portion of the monthly income she actually received from her employer prior to her determined date of disability.

Under the second Finley factor, the Court considers whether Unum's interpretation renders any Plan language meaningless or inconsistent. King, 414 F.3d at 999. Pettit focuses on a provision in the Plan providing that "[e]mployees must be *scheduled* to work at least 30 hours per week" to be eligible for benefits. A.R. 4 (emphasis added). Pettit believes that this provision "suggests that *scheduled* hours, as opposed to average hours worked, are the appropriate measure [for determining gross monthly earnings] under the policy's terms." Pl.'s Br. 34.

Unum's interpretation of "gross monthly income" can be applied consistently with the scheduled hours requirement reference by Pettit. The scheduled hours requirement simply

defines the class of employees who are eligible to receive coverage under the Plan. This require-ment has no bearing upon the method in which an employee's "monthly earnings" are calculated for purposes of determining a participant's monthly benefit payment. Unum's interpretation of "gross monthly income," therefore, does not render the scheduled hours requirement meaning-less or inconsistent. Nor is the Court able to identify other language in the Plan that would be rendered meaningless or inconsistent by Unum's interpretation.

The third <u>Finley</u> factor to consider is whether Unum's interpretation conflicts with the requirements of the ERISA statute. <u>King</u>, 414 F.3d at 999. The Plan language at issue in this case establishes the level of benefits provided to participants who are disabled under the Plan. ERISA leaves the level of benefits conferred under a plan within the control of the private parties creating the plan. <u>Waller v. Hormel Foods Corp.</u>, 120 F.3d 138, 140 (8th Cir. 1997). Unum's interpretation therefore does not conflict with ERISA's requirements.[18]

Under the fourth <u>Finley</u> factor, the Court must consider whether Unum has interpreted the language at issue consistently. <u>King</u>, 414 F.3d at 999. This factor gives the Court some pause, as a review of the record indicates that an Unum representative initially calculated Pettit's benefits based upon her scheduled hours with the understanding that this was the proper method of determining her monthly earnings under the Plan. Unum claims, however, that the calculation of Pettit's monthly benefit payment using scheduled hours was improper. Unum asserts that this error was discovered and corrected during an internal audit and review of Pettit's claim.

---

[18] ERISA does require that plan fiduciaries provide benefits in accordance with the plan's plain language. <u>Davidson v. Wal-Mart Assocs. Health & Welfare Plan</u>, 305 F. Supp. 2d 1059, (S.D. Iowa 2008) (citing 29 U.S.C. § 1104(a)(1)(D)). Whether Unum's interpretation is contrary to the plain language of the Plan, however, is appropriately analyzed under the fifth <u>Finley</u> factor. <u>King</u>, 414 F.3d at 999.

While Unum's inconsistency in interpreting the Plan language at issue may appear suspicious at first glance, this factor does not compel the finding that Unum's interpretation of the Plan is unreasonable. Contrary to Pettit's assertion, the Court finds that Unum's interpretation applied in this case is consistent with the Plan's clear language. As previously indicated, the Plan defines "monthly earnings" as "gross monthly income from your Employer in effect just prior to your date of disability." A.R. 16. In this context, "[i]ncome from your Employer" connotes income actually received. Here, Pettit received income from her employer only for the amount of hours she actually worked. Unum's interpretation of "gross monthly income," as income actually received in the month preceding the determined date of disability rather than potential income based upon scheduled but unworked hours, is therefore entirely consistent with the plain language of the Plan. Unum should not be prohibited from correcting a mistake made during the processing of a claim when the correction is justified by a reasonable interpretation of the Plan language.

The fifth Finley factor requires an analysis of whether Unum's interpretation is contrary to the clear language of the Plan. King, 414 F.3d at 999. The Court has already addressed this issue in its analysis of the previous factor and finds Pettit's interpretation to be consistent with the Plan's clear language.

In light of the foregoing factors, the Court concludes that Unum's interpretation is reasonable and fully consistent with the Plan language at issue. As a result, Unum did not abuse its discretion in calculating Pettit's monthly benefit payments based upon hours actually worked. Additionally, the rate calculation appears correct under Unum's interpretation of the Plan. As a result, Unum's calculation of Pettit's monthly benefit payment must be upheld.

### D. Counterclaim for Overpayment

The Plan provides that "Unum has the right to recover any overpayments due to . . . any error Unum makes in processing a claim." A.R. 7. The record in this case reflects that Pettit received an overpayment of $4,292.32 on her claim due to her receipt of SSA benefits and the initial miscalculation of her monthly benefit payment. Pettit does not deny that Unum has a right to recover overpayments due to an error made in processing her claim. Pettit argues only that the calculation of her monthly benefit payment, and the reduction of her monthly payment to account for her SSA award, was improper. On this record, however, the Court has determined that Pettit's monthly rate calculation and the offset accounting for the SSA award are correct and consistent with the language of the Plan.

ERISA authorizes plan fiduciaries to bring suit to recover overpayments made by a plan to a beneficiary. See 29 U.S.C. § 1132(a)(3)(B)(ii); Gilchrest v. Unum Life Ins. Co. of Am., 255 F. App'x 38, 45-46 (6th Cir. 2007); Dillard's, 456 F.3d at 901. Because the Court finds Unum's overpayment calculation to be correct, Unum is entitled to judgment on its counterclaim.

## III. CONCLUSION

For the reasons stated, Unum's decision must be affirmed. The Clerk of Court is directed to enter judgment in favor of Unum and against Pettit on Pettit's claim. Judgment is also entered against Pettit on Unum's counterclaim in the amount of $4,292.32 with interest.

**IT IS SO ORDERED.**

Dated this 16th day of February, 2011

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT

34